UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | Case No. 3:09-cr-00089 |
| GORDON B. GRIGG, ) | Judge Trauger |
| ) | |
| Defendant. ) | |
| ) | |

## UNITED STATES' RESENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, hereby submits this memorandum in connection with the resentencing hearing for Defendant Gordon Grigg.

## Background

This is a case of investment fraud. Beginning in or around 1996 and continuing until January 2009, Grigg operated a "Ponzi" scheme in which he solicited and obtained money from clients, friends, and acquaintances by falsely promising to invest the money in "safe" investments with fixed annual returns and defined marketable securities. (PSR ¶ 11.) Grigg represented himself to clients and investors as an investment advisor and self-styled "life and financial coach" who brokered fixed-term marketable securities, including certificates of deposit, private placements, corporate notes, debentures, and mutual funds, through an investment company called ProTrust Management, Inc. (PSR ¶ 8.) Despite his representations, Grigg failed to invest client funds in "safe" investments as promised. Instead, Grigg used investor funds for his personal benefit and expenses, to operate ProTrust Management, Inc., and to disburse "fictitious" earnings and return of deposits to clients who cashed out or closed their accounts. (PSR ¶ 11.)

Grigg solicited approximately sixty investors to invest funds in ProTrust Management, Inc. investment accounts totaling approximately $10,922,661. Although he disbursed some of this money in the form of fictitious earnings and return of deposits to clients who cashed out or closed their ProTrust Management, Inc. investment accounts, the total losses to investors as a result of Grigg's Ponzi scheme was approximately $6,140,290.04. (PSR ¶¶ 15, 32.)

The seeds of the Ponzi scheme were sown in 1990, when Grigg began obtaining various securities-related licenses as issued by the National Associate of Securities Dealers, Inc., known now as the Financial Industry Regulatory Authority ("FINRA"). From 1990 through April 2002, Grigg was employed by various broker-dealers registered with the Securities and Exchange Commission ("the SEC"). In April 2002, Grigg was discharged for cause from his then broker-dealer employer after committing multiple compliance violations. (PSR ¶ 10.) Since April 2002, Grigg has not been a registered representative of FINRA, or employed by or registered with any broker-dealer, investment advisor, or other entity registered with the SEC. Nor has Grigg been licensed or registered by the SEC to offer or sell securities or to act as an investment advisor. (PSR ¶ 10.) Despite having no license or registration to offer or sell securities after 2002, Grigg continued to solicit and obtain money from clients, friends, and acquaintances by promoting himself and advertising his talents as a "life and financial coach." It was part of the scheme that Grigg promised investors that he would generate a high rate of return on their investment accounts, and assured them that he would accomplish and sustain earnings by investing in pooled-client purchases of fixed-term certificates of deposit, private placements, corporate notes and debentures, with accounts being titled collectively in the ProTrust Management, Inc. company name. However, Grigg never intended to invest the money and, instead, diverted the money for his own personal benefit and expenses, to operate ProTrust Management, Inc., and to

disburse fictitious earnings and return of deposits to clients who cashed out or closed their investment accounts. (PSR ¶ 11.)

It was further part of the scheme that Grigg made frequent and false representations to clients that their investments were profitable. In order to conceal the Ponzi scheme from clients and to encourage additional investment, Grigg created fictitious investment documents, including fraudulent account statements reflecting clients' ownership of non-existent securities, stock purchase confirmations, invoices, and forged correspondence. However, Grigg's representations were false, and the documents provided to investors were fictitious and created by Grigg to conceal his scheme. (PSR ¶¶ 11-12.)

As a further means of deceiving investors into believing that their funds were safe and properly invested, Grigg falsely claimed to have developed partnerships and special business relationships with several established investment firms, including Berkshire Hathaway, Inc., Goldman, Sachs & Co., Morgan Stanley & Co., Incorporated, and Kohlberg Kravis Roberts & Co. (PSR ¶¶ 11-13.) Such business arrangements between Grigg, ProTrust Management, Inc., and the national investment firms never existed. In order to further deceive clients, Grigg created fictitious documents and correspondence by using counterfeit letterhead and forged signatures from representatives and executives of the national investment firms that seemed to confirm the unique pooled investment opportunities by ProTrust Management, Inc. and the national investment firms. (PSR ¶¶ 13-14.)

In a particularly bold move designed to solicit new investment funds, Grigg falsely represented to clients and investors that he had the ability to invest new and existing client funds in government-guaranteed commercial paper and bank debt as part of the U.S. government's Troubled Asset Relief Program ("TARP"), and falsely claimed that he had invested client funds

3

in the TARP program. (PSR ¶ 15.)  It was Grigg's attempt to deceive investors into believing that he had special access to non-existent funds from the newly created TARP program that raised the suspicion of some investors and resulted in the unraveling of Grigg's Ponzi scheme.

A key part of Grigg's scheme involved his ability to create close personal and religious connections with his victims.  He presented to them a picture of himself as a decent, selfless person who was deeply engaged in charitable and altruistic activities.  He persuaded the victims that he was a good, trustworthy man who shared their religious values and was looking out for their best interests.  This presentation was a cynical ruse.  As Fred Covely, one of the victims, explained:

> On or around July 27, 2006, I wired Mr. Grigg, a.k.a. "Protrust" 1 million US dollars.  By this time Mr. Grigg had engaged in a rigorous campaign of "befriending" me and offering counsel on any variety of personal topics. . . .
>
> On or around August 20th, my 12 year old daughter became critically ill with viral encephalitis.  During the first 3 days in the pediatric intensive care unit she was neurologically completely non-responsive.  Doctors at Children's Hospital in San Diego indicated to us that she might die and if she did not, she would probably be severely damaged neurologically and may live but never "wake up."  I shared this with Mr. Grigg who called regularly to inquire how my daughter was doing.  Several times I mentioned that if she needed long term care I would have to pull part of my investment back to pay for her care.  Mr. Grigg put on a good charade of how concerned he was about my daughter, in retrospect this was sickening.  After about 5 days my daughter slowly started recovering and eventually made a full recovery.  During this time, Mr. Grigg made a real effort to play on my emotions with regard to his concerns for my daughter, my wife, and myself. . . .
>
> In 2008 Mr. Grigg made an intense effort to induce me to give him more money to "invest."  He encouraged me to get money from friends, family, and business associates, anyone I knew that could cough up funds for him.  Tragically in June of 2008 my mother suffered a massive stroke and was left completely paralyzed on the right side.  Again Mr. Grigg called on a regular basis to see how she was doing, but always used the call to remind me that he needed more money. . . .  Mr. Grigg pointed out that if I was able to invest more money with him, the 12-14% returns he was guaranteeing could be used to care for my mom.

4

> Adding insult to injury, my interactions with Mr. Grigg were ones where he constantly referred to his religious beliefs and his alleged deep concern for me and my family, all the while either assuring me my investment was doing well or attempting to coerce more money out of me or the people that I knew. . . .
>
> I have read that he routinely prayed with at least one of his other victims. My own business partner, Charles Martin, who lost about 1.2M mentioned that Mr. Grigg sent him sermons and routinely discussed the Bible with him.

(PSR, Appendix A ¶ 4.)

Karen and Lee Hutchins likewise noted:

> The financial theft from Gordon came as a real shock to us. We had just received a detailed report from him outlining how he believed Lee could retire in just a few years. We believed this money was and had been earning 8% interest for many years in an investment safe from the vagrancies [sic] of the stock market. We have had a relationship with Gordon for 15 years, was invited to his wedding, considered him a friend and a man of God; someone we trusted.

(*Id.* ¶ 11.) Connie Teckenbrook painted a similar picture:

> In 2005, I was divorced and needed to invest my settlement money. [Grigg] flew to Chicago in March, 2006. I invested $200,000 into his private firm. He was very genuine, very trustworthy, caring and sympathetic with what I went through with my divorce. He made me a promise that by the time I turned 62, he will have made me more than a million dollars. He has lied, cheated, and betrayed me.

(*Id.* ¶ 22.)

Rita Jorgensen said, "When I met Grigg in 2008, I was newly divorced. He conned me into sharing my entire personal and financial situation, and then completely took advantage of my vulnerabilities." (*Id.* ¶ 14.) Branko Lukich described Grigg as "a smooth viper in the grass" who "can sell an Eskimo an ice cube." (*Id.* ¶ 17.) Bernice Waters, who was 80 years old at the time, stated, "Someone who could do this to a widow at my age, under the name of God, is a mighty sick person." (*Id.* ¶ 24.) Steve Wieland, a disabled Air Force veteran, noted that Grigg had "lured [him] in as a friend and a brother in religion." (*Id.* ¶ 25.) Wieland attached a letter in which Grigg had asked Wieland to give him power of attorney, stating, "This will make it so I

5

can really act on your behalf should I need to. I know that you are focused on getting back on track and I want you to be all that you want to be, and all I KNOW YOU CAN BE. I just want to make certain that everything can be taken care of while you go through hell and back. We are in for a fight buddy, and I am here to fight with you and beside you. Just want you to know that!!!!" (PSR, App. A, Attachment B.)

Grigg relied on his charm and charisma to manipulate the emotions of vulnerable victims and defraud them out of millions of dollars. As one of the victims explained at the sentencing hearing, "[Y]ou see, I trusted him. He came into my house, wrapped me in his arms, clothed in Jesus Christ and the Christianity that I had, the faith that I had, and promised me as a brother in God, I'm praying for you, and I will take care of you. He took care of me, all right." (DE# 34, Amended Sentencing Transcript, at PageID #: 250.)

## Guidelines Calculations

The United States has no objection to the facts or sentencing-guideline calculations in the Third Revised PSR and Second Addendum. The PSR does not recommend a sentence that deviates from the terms of the parties' plea agreement, and the United States does not object to the recommendations contained therein. The United States does not believe, however, that either of the potential grounds for a departure listed in the PSR is warranted. The Court should therefore find that Grigg's Total Offense Level is 28, and his Criminal History Category is I, yielding a recommended sentence under the advisory guidelines of 78 to 97 months.

## Sentencing Considerations Under 18 U.S.C. § 3553(a)

In addition to the guidelines calculation, the Court must also consider the factors set forth in 18 U.S.C. § 3553(a). Those factors demonstrate that the Court's original 120-month sentence

6

was reasonable, and that a sentence significantly lower than what was originally imposed would not be sufficient to comply with the purposes set forth in the statute.

### A. Nature and Circumstances of the Offense

As the Court noted at Grigg's 2009 sentencing hearing, "the circumstances of the offense are . . . extremely aggravated." (DE# 34, Amended Sentencing Transcript, at PageID #: 266, 271.) This case "is very similar to the very famous Madoff Ponzi scheme," but with "a more vicious twist." (*Id.* at 264.) It involves both "a pattern of preying on vulnerable individuals, people in crisis, in difficult spots in their lives," and "the use of religion and appealing to common religious values on the part of the victims." (*Id.* at PageID #: 265.) Nothing that Grigg has presented in connection with this resentencing changes those facts.

Likewise, nothing changes the fact that Grigg's crime inflicted terrible damage on his victims. All of the victims suffered significant financial loss; for some, the loss was devastating. Many depended on the money to fund their imminent retirements, or to pay tuition costs for themselves or their family members. For example, Ralph Griggs stated, "I will never be able to retire and can only pray that my health never fails—otherwise we could become destitute." (PSR, App. A, ¶ 8.) Rita Jorgensen explained that, as a result of the fraud, she was unable "to send [her] grandson to prep school as [she] had promised him," and also lost her "youngest daughter's educational fund." (*Id.* ¶ 14.)

Grigg's fraud has also taken a physical and emotional toll on the victims. Dr. Lee Koon described "[r]ecurrent depression and anger. (*Id.* ¶ 16.) Shandton Williams stated that "[i]t is difficult to put into words the emotional trauma [Grigg's] deceit has caused." (*Id.* ¶ 26.) Ralph Griggs stated, "The emotional trauma has been the most difficult thing I've experienced in my life . . . the grief nearly unbearable. I have lost so much weight that people ask me if I am sick."

7

(*Id.* ¶ 8.) Connie Teckenbrook stated, "I worry now, what I am supposed to live on. It makes me physically, mentally, and emotionally sick." (*Id.*¶ 22.) Karen Hutchins noted, "I am very depressed on a daily basis; and currently experiencing headaches of increased frequency. As a result, I have just been referred to physical therapy." (*Id.* ¶ 11.) Bernice Waters stated, "He has caused me many sleepless nights, depression and worry that a person my age [80 at the time of the statement] should not have." (*Id.* ¶ 24.)

Perhaps worst of all, the nature and execution of Grigg's fraud has shaken some of the victims' religious faith, and undermined both their self-worth and their trust in their fellow man. As Karen Hutchins said, "[Grigg] has made me question myself, the people I go to church with, and to wonder whom can I really trust." (*Id.* ¶ 11.) Rita Jorgensen said, "My self-esteem has suffered immensely. I feel like such a fool, that somehow I am to blame for not seeing through this deception and lies." (*Id.* ¶ 14.)

The effects of these injuries are not of the type that heals easily with time. As Mike Elrod noted, "We victims now have a LIFETIME sentence of stress, broken dreams, and suffering." (*Id.* ¶ 5.) Karen Hutchins has also stated, in a letter from August 2013, "We have had many counseling sessions with our pastor, not just for weeks or months; coming to terms with this has taken years for me." (DE# 58-2.)

In sum, this was an extremely serious offense, with terrible consequences both for the victims themselves and for their family members, friends, and members of their communities. As the Court noted at sentencing, "although this is not a violent offense, it has done violence in many ways to the victims." (DE# 34, Amended Sentencing Transcript, at PageID #: 264.)

8

## B. History and Characteristics of the Grigg

In his sentencing memorandum, Grigg makes significant effort to focus the Court's attention on his purportedly admirable character and charitable deeds. Indeed, Grigg has provided testimonials from a variety of individuals, each of whom has attested to his good character and selfless behavior during their period of acquaintance. The government respectfully requests, however, that the Court consider these testimonials and arguments with appropriate circumspection. In effectuating his Ponzi scheme, Grigg's *modus operandi* was to use his charisma and charm to win the trust, admiration, and affection of his victims. Indeed, many of the good acts that his character witnesses now speak of are nearly identical to the techniques Grigg once used when soliciting new clients for fictitious investments. If Grigg's victims been asked about his character before the Ponzi scheme unraveled, many of them—including those, like Karen Hutchins, who had known him for fifteen years or more—would have spoken confidently and effusively about his good character and his beneficial influence on their lives.

Grigg carefully cultivated an image of himself as religious and altruistic person, always looking out for the best interests of others. But in fact, at the very same time that he was presenting this image to his victims—praying with them, promising them that they would have enough money to pay for their loved ones' medical expenses, giving them advice on the most sensitive aspects of their lives, telling them, "We are in for a fight buddy, and I am here to fight with you and beside you"—he was deliberately stealing their money and lying to them to cover his tracks. As Fred Covely said, at the time that Grigg was expressing seemingly sincere concern for Covely's gravely ill daughter, he had in fact "given most of [their] money away, but was still lying through his teeth with a father and a mother who had a dying 12 year old in the hospital.

9

And if that doesn't speak to the predatory nature of his crimes, I don't know what does." (DE# 34, Amended Sentencing Transcript, at PageID #: 258-59.)

While Grigg suggests that his character changed dramatically beginning on or around January 28, 2009—after his scheme was unmasked and "a weight lifted" off him—it is hard not to question whether such a rebirth truly revealed "a genuine, sincere Gordon Grigg." (DE# 50.) In fact, it would appear that in the lead-up to his 2009 sentencing hearing, he continued to attempt to manipulate his victims to advance his own self-interest. For example, he sent a letter to the victims telling them that he had a plan to pay each of them back and a job opportunity in which he "could earn as high as 3M annually." (DE# 58-1.) He then emphasized to them, "The shorter my prison sentence the sooner I can start paying you back. . . . I am praying that you will send a letter to my lawyer requesting I get as short a sentence as possible so I can start paying you back now while the job is available." (*Id.*) He also told them that although some victims had already expressed their wish that he spend his life in prison, "I know God has a different plan. I have enclosed a CD you may want to listen to. It is from a Pastor who has spoken to me since this came to light." (*Id.*) In short, a cynical view would suggest that Grigg, in a period when he had supposedly abandoned his previously manipulative ways, he was continuing to manipulate his victims by playing on their religious beliefs and telling them that they could all make their money back if they took steps to keep him out of jail.

Some of the victims who experienced his manipulation first-hand did not believe that his change-of-heart was sincere. Fred Covely noted at sentencing, "[Grigg's] actions are very predictable. For example, at this time what he has basically told his victims is, hey, I can't make money for you if I am in jail, therefore you need to argue for me being out of jail. Along with the continued undertone that, I'm a Christian, Jesus has forgiven my sins; you need to do the

10

same for me. And so that's obviously hypocritical and disgusting, adding insult to devastating amounts of injury. And that's exactly where he is at today." (DE# 34, Amended Sentencing Transcript, at PageID #: 261.) Karen Hutchins has also noted that Grigg sent a letter to her and her husband in September of 2012, asking for their forgiveness and invoking their shared religious values. According to Hutchins, with this letter Grigg "was again playing on my faith. Do I believe he is sorry? Certainly, he is very sorry he got caught." (DE# 58-2.)

Grigg also contends that "his conduct and decision making after being contacted by the SEC civil division shows an atypical, extraordinary acceptance of responsibility and genuine remorse for his crime." (DE# 50.) To the contrary, Grigg's conduct and decision making are entirely consistent with a straightforward attempt to maximize his own self-interest. Grigg operated his Ponzi scheme for well over a decade. He could have stopped the fraud and the lies and come clean at any point, but he consistently chose not to. When an investigation into his fraud by the State of North Dakota resulted in a substantial fine and a cease-and-desist order against him, he still chose not to come clean. Instead, he simply continued to cover his tracks. Alan Bromka said that when he questioned Grigg about the North Dakota judgment, "[h]e outright lied to me that it was a mistake and was resolved." (PSR, App. A, ¶ 3.) It was only when the SEC began to unravel his web of lies that he realized the jig was up, and decided to turn himself in and seek leniency. This is indicative of a calculating actor pursuing his own self-interest, not the actions of a person who acts out of true remorse and contrition.

### C. The Need for the Sentence Imposed

*1. Reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment for the offense*

As noted above, this is an extremely serious offense that warrants a lengthy sentence in order to promote respect for the law and provide just punishment for the offense.

11

*2. Affording adequate deterrence to criminal conduct*

Ponzi schemes require deterrence, which can only be accomplished through lengthy periods of incarceration. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id*. Put differently, as the Seventh Circuit has explained, "[t]he system of penalties under the Guidelines is constructed on the belief that . . . longer sentences of imprisonment, are more effective deterrents. A large body of evidence supports this intuition." *United States v. Turner*, 998 F.2d 534, 536 (7th Cir. 1993).

*3. Protecting the public from further crimes of the defendant*

Grigg contends that "[t]here is absolutely no likelihood of recidivism." Yet he also maintains that, upon his release, he will immediately utilize his "incredible sales presence" to earn hundreds of thousands—perhaps even millions—of dollars in sales commissions each year by persuading people to part with their money. It is difficult to accept at face value that there is absolutely no risk that, after decades as a fraudster and inveterate liar, he will never do the same thing again. Karen Hutchins recently said, "Do I believe that if this man is released from prison, will he be rehabilitated? No, I do not." (DE# 58-2.) Moreover, Grigg's prior scheme did not depend on him having particular financial licenses; instead, Grigg solicited victims' funds by holding himself out to be a "life and financial coach." As such, the fact that he can no longer lawfully sell securities would not, by itself, prevent recidivisim, as it has in other cases.

12

### C. The Need to Avoid Unwarranted Sentencing Disparities

As the Court noted at the sentencing hearing, Ponzi schemes are more serious than many other types of property crimes. Sentencing practices in Ponzi scheme cases have reflected this fact. Each case and each defendant is unique, and the government is cognizant of the Sixth Circuit's admonition that comparisons to individual cases may have only marginal relevance. *See United States v. Thomas*, 395 F. App'x 168, 175 (6th Cir. 2010). Nevertheless, it is worth considering sentences that defendants have received nationwide in cases involving a comparable loss amount and a similar number of victims. For example:

- Glyn Richards. Loss amount of $5.237 million; 61 victims. Sentenced to 360 months. (D.N.J. Case No. 08-cr-442, *affirmed by* 3d Cir. Case No. 09-2956.)

- Philip Rossi. Loss amount of $3.531 million; 40 victims. Sentenced to 144 months. (N.D. Ohio Case No. 08-cr-468, *affirmed by* 6th Cir. Case No. 09-3929.)

- Rod Cameron Stringer. Loss amount of $7.458 million; 28 victims. Sentenced to 120 months. (N.D. Tex. Case No. 09-cr-42, no appeal filed.)

- James Gordon Rogers. Loss amount of $472,000; 9 victims. Sentenced to 120 months. (S.D. Tex. Case No. 09-cr-13, *affirmed by* 5th Cir. Case No. 09-20595.)

- Judith Zabaloui. Loss amount of $5.003 million; 35 victims. Sentenced to 97 months. (E.D. La. Case No. 09-cr-44, no appeal filed.)

- Phillip D'Hedouville. Loss amount of $1.226 million; 61 victims. Sentenced to 97 months. (D.N.J. Case No. 09-cr-567, no appeal filed.)

- John Mark Donnelly. Loss amount of $5.435 million; 21 victims. Sentenced to 90 months. (W.D. Va. Case No. 09-cr-15, no appeal filed.)

In sum, the sentence that the Court originally imposed on Grigg was consistent with the national norms for Ponzi schemes of this size and scope. A sentence significantly lower than the 120 months he originally received would create an unwarranted disparity with sentences imposed by courts throughout the country.

## Conclusion

The government respectfully submits that, in light of the seriousness of the offense, the severe harm done to the victims, the need for deterrence, and the trends in Ponzi scheme sentencing, a sentence at or above the top end of the applicable guidelines range would be sufficient, but not greater than necessary, to comply with purposes of 18 U.S.C. § 3553(a).

Respectfully submitted,

DAVID RIVERA
Acting United States Attorney for the
Middle District of Tennessee


s/ *Cecil W. VanDevender*
Cecil W. VanDevender
Special Assistant United States Attorney
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203
615-736-5151

## Certificate of Service

I hereby certify that on August 20, 2013, a true and exact copy of the foregoing document was delivered via the Court's electronic filing system to:

Kimberly S. Hodde
Hodde & Associates
40 Music Square East
Nashville, TN 37203

s/ *Cecil W. VanDevender*
Cecil W. VanDevender
Special Assistant United States Attorney